UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------------x

MATHEW BIANCHI

Docket No:    1:23-cv-04456

**<span style="color:red">AMENDED</span> COMPLAINT**

Plaintiff,

-against-                                                     **JURY DEMAND**

THE CITY OF NEW YORK, and ANDREY SMIRNOV,
Individually

Defendants'

------------------------------------------------------------------------------------x

The plaintiff, MATHEW BIANCHI by his attorney THE LAW OFFICE OF JOHN A.

SCOLA, PLLC., as and for his <span style="color:red">amended</span> complaint against defendants' THE CITY OF NEW

YORK; and ANDREY SMIRNOV, Individually.

## INTRODUCTION

This is a civil rights action on behalf of the plaintiff MATHEW BIANCHI (hereinafter referred

to as "plaintiff") to vindicate his rights as an employee of defendant THE CITY OF NEW YORK as a

result of defendants' defendants' THE CITY OF NEW YORK; and ANDREY SMIRNOV,

Individually  unlawful conduct.

## JURISDICTION AND VENUE

1.     The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 1965, 28 U.S.C.

       §§ 1331, 1343 and 2202 to secure protection of and to redress deprivation of

       rights secured by:

2.     The unlawful employment practices and violations of plaintiff's civil rights

       complained of herein were committed within the Southern District of New York.

## PROCEDURAL REQUIREMENTS

3.     Plaintiff has filed suit with this Court within the applicable statute of limitations period.

## PLAINTIFF

4.     Plaintiff MATHEW BIANCHI is a male citizen of the United States of America, over twenty-one (21) years of age, resident of Richmond County and is an employee of defendant THE CITY OF NEW YORK more specifically the New York City Police Department (hereinafter referred to as "NYPD").

5.     Plaintiff BIANCHI is Cuban-American man who descended from relatives that descended from Cuba. As such Plaintiff is Hispanic.

## DEFENDANTS'

6.     Defendant THE CITY OF NEW YORK is a municipal corporation organized and existing under and by virtue of the law of the State of New York, and plaintiff's employer.

7.     Defendant ANDREY SMIRNOV is an employee of the New York City Police Department and City of New York and currently holds the rank of Deputy Inspector.

## BACKGROUND

8.     Plaintiff joined the NYPD in July 2015.

9.     Following successful completion of the Police Academy, Plaintiff was assigned to the 123rd Precinct in Staten Island.

10.     Plaintiff was initially assigned to regular patrol as a police officer where he excelled.

11.     Plaintiff was assigned to the Traffic Unit in 2017.

12. The Traffic Unit is one of many specialized units within a precinct which allow officers to advance their careers and earn greater income.

13. Specifically, some of these specialized units allow officers to be placed on an investigatory track which could ultimately result in their promotion to detective.

14. Further, officers assigned to these specialized units earn significantly more overtime than their peers who are assigned to regular patrol.

15. Plaintiff excelled in the Traffic Unit.

16. In 2018 and 2019, Plaintiff received stellar performance evaluations.

17. Plaintiff in the Traffic Unit would be responsible for enforcing traffic violations during his tour.

18. This consists, mostly, of car stops and the issuing of tickets for traffic violations.

19. When an officer makes a car stop, he asks the driver for their license and registration.

20. Early on in his career in the Traffic Unit, Plaintiff issued a ticket to a civilian that he stopped who had a New York City Police Department Courtesy Card.

21. A Courtesy Card is a card issued to members of service within the NYPD based on their union affiliation.

22. For example, a Police Officer would be issued a Courtesy Cards through the Police Benevolent Association, Detectives through the Detective Endowment Association, Sergeants through the Sergeants Benevolent Association, Lieutenants through Lieutenants Benevolent Association and then Captains and above through the Captains Endowment Association.

23. A member of service is given these cards to distribute to family members and friends to carry with them.

24. Courtesy Cards' purpose are exactly as they sound, if a person who has one of these cards comes into contact with a member of service, then that member of service is supposed to extend that person every courtesy possible.

25. In practice this means that if a person commits a violation of law then the member of service is supposed to use their discretion and give that person a warning.

26. Many members of service issue these cards in exchange for benefits from civilians such as discounts and benefits.

27. These could include a break on a price for a contractor or a mechanic.

28. As a result of this lack of familiarity with the person holding the Courtesy Card, an officer who stops someone with a card will sometimes contact the member of service who provided them with the card in order to verify the validity of the card.

29. On November 28, 2018, Plaintiff made a car stop where a Courtesy Card was presented to him during the stop.

30. Plaintiff issued a ticket in spite of the card.

31. Following this interaction, Plaintiff was approached by Police Benevolent Association ("PBA") Delegate Cassano who had an argument with Plaintiff about writing the ticket.

32. On December 13, 2018 Trustee Albert Acierno, Chairman, Board of Trustees for the PBA met with Plaintiff.

33. Acierno informed Plaintiff that he had to obey the PBA cards.

34. Acierno told Plaintiff "You have to do it. We are the ones who protect you if you need it."

35. Acierno then explicitly told Plaintiff if he wrote tickets to people who had the Courtesy Cards then the Union would not protect him.

36. Further, Plaintiff was informed that if the Union threat was not enough, if he continued to write tickets to people with cards then Acierno would call Chief Kenneth Corey and have him removed from Traffic.

37. Acierno was insinuating that if Plaintiff wrote tickets to people who had PBA cards then the Union would no longer protect him.

38. Following this exchange, Plaintiff filed an anonymous complaint with the New York City Department of Investigation ("DOI") office on December 15, 2018 via an email account Plaintiff created for the purpose of filing the complaint.

39. On February 3, 2019, DOI responded to the anonymous complaint by answering the email.

40. On March 3, 2019, Plaintiff was informed by Sergeant Vaiano to be careful because body cameras were being watched because of PBA cards.

41. On March 14, 2019, Plaintiff filed an anonymous complaint with the NYPD Internal Affairs Division.

42. This complaint was about the PBA Cards being used to negate violations of law and was made outside the scope of Plaintiff's normal job duties and responsibilities.

43. At all times herein, the use of PBA or other Union Courtesy Cards to avoid discipline for infractions of law is a matter of public concern.

44. In practice, civilians who have Courtesy Cards drive in a much more dangerous and unlawful ways which creates a greater risk to the public.

45. Further, police officers who work in the Traffic Unit are required to have a certain number of tickets issued per month.

46. White drivers in Staten Island where Plaintiff works, are significantly more likely to have Courtesy Cards then minority drivers.

47. As a result of the quota policy and the unwritten rule that you cannot write tickets to civilians with Courtesy Cards police officers are forced to disproportionately ticket minority drivers as they are less likely to possess the Courtesy Cards or have affiliations with law enforcement.

48. Further, since officers are required to improve upon the numbers of infractions that they summon, police officers are not allowed to use their discretion within minority civilians or risk being disciplined by the NYPD.

49. While technically Police Officers still had discretion to issue these civilians a warning, in practice if they did so they would not be able to meet their quota and would be adversely punished.

50. Plaintiff filed another anonymous complaint with Internal Affairs on August 6, 2019, IAB Log # 2019-30261.

51. On August 16, 2019, Plaintiff again stopped a motorist who had a PBA card because he worked for Captain Bocchino's brother.

52. Plaintiff had stopped this civilian previously and had to "91" him which is code for issue him a warning.

53. Despite the repeat stop, Plaintiff had to only issue him warning.

54. On September 5, 2019, Plaintiff was informed by Sergeant Valano, that Chief Vega and Detective MATHEW Reich had been watching his body camera videos since September 3, 2019 after Plaintiff stopped the guy who "hooks up cops with cell phones" on a prior stop because Plaintiff allegedly gave him a "hard time" during the car stop.

55. On September 7, 2019, Plaintiff met with Commanding Officer Wilson about car stops where a motorist had Chief Vega's card.

56. After Plaintiff informed Wilson that he did not agree with the Courtesy Card policy, Wilson asked Plaintiff "is it better to be right or better to be on patrol?"

57. On September 26, 2019, Plaintiff wrote a ticket to Thomas Colucci, the father of a State Trooper.

58. This angered the Trooper who made a call to Police Headquarters at One Police Plaza to complain about the ticket.

59. Police Headquarters then calls the desk in the 123rd Precinct.

60. Following this phone call, Plaintiff's body camera footage of the ticket is reviewed several times.

61. Wilson then calls Plaintiff into his office to let him know what is going on and then calls New York State trooper's Barrick's Commander to squash the situation.

62. On September 27, 2019, Plaintiff speaks with Wilson in the Juvenile Room about the stop the previous day.

63. Wilson states that he spoke with the trooper's Captain, reviewed the video, and saw that Plaintiff was courteous and did not write over his Courtesy Card.

64. On December 21, 2019, several posts are made against Plaintiff in a Facebook group by Ken Licata which elicits hundreds of negative responses.

65. Licata is a retired NYPD officer who posted on a predominately law enforcement forum.

66. On January 20, 2020, Plaintiff is harassed by Police Officer Gonzalez from the 120th Precinct over writing an infraction on back of his father's 2019 card even though he issued the man only a warning.

67. On April 18, 2020, Plaintiff wrote a summons to Bernadette Rioatta, who is a relative of Member of Service Doug Wihlborg.

68. Following this ticket, Doug Wihlborg posted on Facebook bashing Plaintiff.

69. Undeterred Plaintiff continues to issue tickets to some civilians who have Courtesy Cards.

## CLAIMS WITHIN THE STATUTE OF LIMITATIONS

70. Plaintiff, from June 2020 until the present date has repeatedly engaged in protected activity and speech by complaining about the NYPD's policy of giving preferential treatment to civilians who possess Courtesy Cards.

71. Plaintiff makes these complaints outside the scope of his normal employment.

72. These complaints are made both inside and outside of Plaintiff's Command.

73. Plaintiff often makes complaints within his command to supervisors outside the time of his scheduled tour and outside the scope of his normal employment.

74. The complaints of preferential treatment and lack of enforcement of crimes towards civilians who possess Courtesy Cards is a matter of public concern in that

civilians who have these cards often drive in a reckless manner, without fear of being prosecuted, which puts the public at risk due to their reckless driving.

75. For the reasons stated below, Plaintiff was subjected to adverse actions due to his engagement in protected speech.

76. Such adverse actions taken against Plaintiff were done purposefully to deter Plaintiff, and others who could engage in protected speech, from engaging therein.

77. On June 12, 2020 Plaintiff stopped civilian Joseph Fumando at Richmond and Amboy in Staten Island.

78. During the stop, Inspector Delahanty, contacted Plaintiff over the radio where everyone could hear.

79. Inspector Delanhanty then called Plaintiff and Ordered him not to issue the ticket to Fumando

80. Plaintiff had no choice but to give the driver a warning.

81. Inspector Delahanty called Plaintiff a half an hour later to thank him for the courtesy.

82. Following the stop, Plaintiff googled Joseph Fumando and found that he is a "perp" who was previously linked to illegal gambling involving members of the NYPD.

83. Plaintiff was subsequently spoken to by his supervisors about the stop.

84. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

85. This complaint was made outside the scope of Plaintiff's normal employment.

86.     On June 12, 2020, Wilson approached Plaintiff and informed him that he needs to be asking explicitly for Courtesy Cards during each stop or at the very least asking if "that is all your information" in order to make sure Plaintiff gets the PBA cards.

87.     On June 15, 2020, Plaintiff was pulled aside at a Randall's Island detail during Black Lives Matter protests by Police Officer and PBA Board Member John Puglisi as he recognized Plaintiff as the BIANCHI from the 123rd Precinct who writes tickets over cards.

88.     Puglisi proceed to reprimand Plaintiff with Trustee Acieno who was also present.

89.     On August 15, 2020, Plaintiff received notice that he was going to be subjected to an NYPD internal interrogation referred to as GO-15.

90.     In September 2020, then Captain Defendant Andrey SMIRNOV took over as Commanding Officer of the 123rd Precinct.

91.     On December 18, 2020, Plaintiff is told by Sergeant Liter that Inspector Brower called Defendant SMIRNOV to tell him that "Ramos has a history of writing over cards," and that "it needs to be handled."

92.     Plaintiff was involved in a car stop of Megan O'Leary on January 29, 2021.

93.     After pulling over the civilian, she refused to give documentation other than her PBA card.

94.     During the car stop, Plaintiff called Police Officer Thomas O'Leary from the 66th Precinct.

95.     This stop really annoyed Plaintiff's delegate Pete Evenson who was unhappy that Plaintiff has his body worn camera on during the stop.

96. Evenson stated that he was not going to tell Plaintiff what to do in regard to the stop because he has his camera on all he was going to say is that "it is an MOS sister."

97. Plaintiff took the officers information and gave the woman a warning.

98. Plaintiff was subsequently spoken to by his supervisors about the stop.

99. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

100. This complaint was made outside the scope of Plaintiff's normal employment and constitutes protected speech.

101. On February 27, 2021, Plaintiff stopped James Ryan who had the 2016/2017 card of Robert Brower.

102. Plaintiff questioned the cards they were several years old before letting them go with only a warning.

103. Plaintiff was subsequently spoken to by his supervisors about the stop.

104. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

105. This complaint was made outside the scope of Plaintiff's normal employment.

106. On March 3, 2021, Plaintiff stopped a Toyota Rav4 for using the phone in his hand over the center console which was unsecured and for failing to wear a seat belt.

107. The car was being driven by Inspector Nicholas Fiore who proceeded to scream at Plaintiff for pulling him over.

108. During the course of being berated, Inspector Fiore stated that he had to hang up with Chief Harrison because he was being pulled over.

109. Following the stop, Inspector Fiore called Defendant SMIRNOV and instructs him to tell Plaintiff he was sorry how he acted during the traffic stop.

110. Plaintiff was subsequently spoken to by his supervisors about the stop.

111. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

112. This complaint was made outside the scope of Plaintiff's normal employment.

113. This complaint constitutes protected speech.

114. On August 26, 2021, Plaintiff stopped Caeli Pomponio for speeding whose husband is a sergeant for the NYPD.

115. Plaintiff called Sergeant Pomponio during the car stop because his wife was being rude and aggressive.

116. Plaintiff extended her the courtesy and did not write the ticket.

117. Following the car stop, Sergeant Pomponio made a complaint against Plaintiff in retaliation for him stating that if she wasn't the sergeant's wife then he would have issued her a ticket.

118. Sergeant Pomponio specifically made false allegations against Plaintiff which he claimed happened during the car stop.

119. The Integrity Control Officer Lt. Tovar reviewed Plaintiff's body cameras and found no wrongdoing.

120. Plaintiff was subsequently spoken to by his supervisors about the stop.

121. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

122. This complaint was made outside the scope of Plaintiff's normal employment.

123. This complaint constitutes protected speech.

124. After each conversation with his supervisors over the Courtesy Cards, Plaintiff felt more and more pressure to only issue warnings to people who have the cards.

125. This causes Plaintiff to suffer severe emotional distress as he is being asked to treat people differently depending on their connections which, to Plaintiff, is unethical.

126. On September 6, 2021, Plaintiff received a call from his Sergeant explaining that Chief Baldasano had called Defendant SMIRNOV because Plaintiff called him at 2:00 am over a Courtesy Card.

127. Plaintiff was informed that the issuance of a ticket to over the Card was a big deal and that he is no longer supposed to call officers who held the rank higher than Lieutenant whose names are on the back of cards.

128. Plaintiff was not working at the time of the alleged call and phone records show that he did not make the call to the Chief yet was reprimanded anyway.

129. On September 17, 2021, Plaintiff receives a complaint from Lieutenant Nichols because Plaintiff stopped his brother the day before and during the stop told him that "it didn't matter that he had a Courtesy Card, he must wear his seatbelt regardless of having the card."

130. Plaintiff was subsequently spoken to by his supervisors about the stop.

131. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

132. This complaint was made outside the scope of Plaintiff's normal employment.

133. This complaint constitutes protected speech.

134. On December 2, 2021, Plaintiff stops Mrs. Kirschner.

135. During the stop Mrs. Kirschner calls her husband, a retired member of service, who proceeds to call Plaintiff.

136. During the call, Plaintiff is berated by Kirschner and told how cops today should act and threatened by stating "watch what happens if you write this (ticket)."

137. Kirschner further stated that he in the process of running his time before retirement and that he used to drive the Police Commissioner.

138. Against Plaintiff's better judgment he chose to issue Mrs. Kirschner only a warning.

139. Plaintiff subsequently speaks with Mrs. Kischner's son, who is a current police officer in the 121st Precinct.

140. The son also berates Plaintiff and threatens him by stating "watch what happens if I stop someone you know."

141. Kischner's son then complains to his PBA Delegate and calls the Desk Sergeant in order to prevent Plaintiff from writing the ticket.

142. The Sergeant calls Plaintiff to inform him that Kischner called but allows Plaintiff to issue the ticket.

143. Mr. Kischner also calls the PBA to complain about Plaintiff.

144. Plaintiff was subsequently spoken to by his supervisors about the stop.

145. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

146. This complaint was made outside the scope of Plaintiff's normal employment.

147. This complaint constitutes protected speech.

148. On December 23, 2021, during the course of a car stop, Plaintiff is contacted by Sergeant Hansen in regard to a male stopped with a 2020 Deputy Inspector Card.

149. Sergeant Hansen asks Plaintiff to only issue the male a warning and wanting to know if Plaintiff had already written the ticket.

150. Plaintiff is also contacted by Sergeant Liter and asked whether he already wrote the ticket and to refrain from doing so if he hadn't already.

151. This same conversation happens with a Lieutenant later and again through the Traffic Office.

152. During the conversations about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

153. This complaint was made outside the scope of Plaintiff's normal employment.

154. This complaint constitutes protected speech.

155. On February 17, 2022, Plaintiff stops motorist Lisa Siminson at 16:54 and issues her a ticket.

156. Plaintiff completes the ticket and is about to issue it when she informs him that she is a friend of Defendant SMIRNOV.

157. Plaintiff addresses the incident on his body warn camera and issues the ticket as it was already completed.

158. Plaintiff was subsequently spoken to by his supervisors about the stop.

159. On March 4, 2022, Plaintiff is approached by Sergeant Liter and asked to about the stop of Lisa Siminson.

160. Plaintiff is asked if he could "lose" the ticket in Court which Plaintiff refused to do.

161. When Plaintiff refused he was repeatedly asked whether this "was what he wanted to do" in an effort to get rid of the ticket.

162. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

163. This complaint was made outside the scope of Plaintiff's normal employment

164. This complaint constitutes protected speech.

165. On March 17, 2022, Plaintiff emails the Family Medical Leave Act ("FMLA") office about taking leave.

166. Plaintiff is informed that he is eligible for FMLA leave.

167. Plaintiff is subsequently informed by Sergeant Liter that if he takes FMLA leave he may not be able to get back into the Unit upon his return because Defendant SMIRNOV needs numbers.

168. Plaintiff then calls FMLA and is informed that what Sergeant Liter said is not true and his leave is not up to the precinct bosses.

169. On June 3, 2022, Plaintiff stopped and then issued a summons to Kelli Ann Tota.

170. Tota was friends with Lieutenant Pugni.

171. Pugni subsequently called the desk and Plaintiff was called over the radio.

172. Plaintiff was informed that Pugni had tried to call his Administrative Lieutenant and then Borough because Plaintiff issued a ticket to someone he knew.

173. Plaintiff was then ordered to return to the Command and questioned over the issuance of the ticket.

174. Plaintiff was subsequently spoken to by his supervisors about the stop.

175. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

176. This complaint was made outside the scope of Plaintiff's normal employment.

177. This complaint constitutes protected speech.

178. On August 18, 2022, Plaintiff stops the father of member of service Alarcon.

179. Upon stopping Alarcon's father, the father just waives the PBA Card out the window instead of identification and asks Plaintiff if he knows "Johnny."

180. Plaintiff speaks with Alarcon on FaceTime who proceeds to try to tell Plaintiff not to bother with the vehicle report.

181. Plaintiff issues the father only a warning but still fills out the report.

182. Despite issuing Alarcon's father a warning, Alarcon still complains to the Officer Center about Plaintiff.

183. Plaintiff texts Alarcon to tell him if he has a complaint he should come to him directly to which Alarcon states "Oh I will don't worry."

184. Plaintiff was subsequently spoken to by his supervisors about the stop.

185. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

186. This complaint was made outside the scope of Plaintiff's normal employment.

187. This complaint constitutes protected speech.

188. On August 31, 2022, Plaintiff stops motorist Sengul Mersimovski who presented the card of Detective Buddin.

189. Plaintiff calls Detective Buddin during the stop and explains to him that based on the Vehicle History report Mersimovski has been stopped on multiple occasions previously and then describes the list of infractions that he stopped her for on this occasion.

190. Plaintiff informs Detective Buddin that if Mersimovski continues to drive recklessly that he may not extend the courtesy of a warning during the next car stop.

191. Detective Buddin proceeds to become so upset with Plaintiff for stopping Mersimovski that he calls the precinct Telephone Switchboard operator to get Plaintiff's PBA delegates information in order to get Plaintiff in trouble for questioning his card.

192. Plaintiff was subsequently spoken to by his supervisors about the stop.

193. During the conversation about this stop, Plaintiff again complains about the Courtesy Cards and how they are unfair to civilians who do not have them and are resulting in recidivist motorists who are a danger to the public.

194. This complaint was made outside the scope of Plaintiff's normal employment.

195. This complaint constitutes protected speech.

196. On August 31, 2022, Plaintiff stops and then issues a ticket to Lisa Foriello.

197. On September 2, 2022, Plaintiff is transferred out of the Traffic Unit and placed back into regular patrol.

198. Plaintiff is also transferred from the day to the 4:00 x 12:00 tour purposefully as it causes him a hardship related to his childcare arrangement.

199. This change in assignment was done as a result of Plaintiff's complaints about the use of Courtesy Cards and because he issued a ticket to someone who knew someone "high up" in the Department.

200. This adverse action was taken in retaliation for Plaintiff's engagement in protected speech.

201. As a result of this change in assignment, Plaintiff suffers a great hardship related to his childcare responsibilities.

202. Further, Plaintiff as result of the change is caused to suffer great emotional distress including lost sleep, lost hair due to the stress and embarrassment.

203. Plaintiff later learns that this demotion was a result of the ticket he issues Lisa Foriella on August 31, 2022 who was apparently friends with Chief Maddrey.

204. Plaintiff is informed by Lieutenant Tovar that the ticket to Foriella "pissed off someone very high up" and that the transfer back to patrol would only be for a week as punishment for the issuance of the ticket to Foriella.

205. Lieutenant Tovar then tells Plaintiff that Chief Maddrey called Defendant SMIRNOV and ordered that he punish Plaintiff for writing the ticket.

206. Foriella never even mentioned that she knew Maddrey during the stop and the stop was otherwise unremarkable.

207. Nevertheless, Plaintiff is stripped of his position within the specialized Traffic Unit.

208. On September 3, 2022, Plaintiff receives a notification that he was formally removed from the Traffic Unit and placed on patrol in the 4 x 12 tour.

209. These adverse actions were taken within days of Plaintiff's complaints related to the Courtesy Cards which occurred outside the scope of his employment about a matter of public concern.

210. Plaintiff immediately calls Lt Tovar about the demotion and is told that there was nothing he could do and that Defendant SMIRNOV is leaving soon and he will see if he can place him back in the Traffic Unit after the Commanding Officer leaves.

211. Plaintiff then calls Sergeant Liter to complain about the demotion.

212. Liter states that he feels bad but there is nothing he can do.

213. Plaintiff immediately contacts Defendant SMIRNOV and explicitly tells him that the transfer back to patrol is unlawful retaliation for his complaints related to the Courtesy Cards and that this transfer was unlawful punishment.

214. Plaintiff further states that he wants to file a grievance with his union related to the Defendant SMIRNOV enforcing quotas on his police officers.

215. Defendant SMIRNOV writes back to Plaintiff that the sudden demotion was not retaliatory nor punitive.

216.    Plaintiff files a formal complaint with Internal Affairs (IAB Log # 2022-20974)

and the Civilian Complaint Review Board.

217.    The Complaint reads as follows:

"I am a Police Officer in the 123 Precinct in Staten Island. I am filing this complaint to report misconduct in my department. My report is primarily in regards to patterns and practices of wrongdoing, corruption, and conflicts of interest.

Until yesterday I was assigned to the traffic unit in my precinct. My primary function was to issue summonses to motorists that commit traffic violations. I was removed as punishment because I wrote a lawful summons to a motorist that is a nurse and is friends with a chief in my department. This happened on 8/31/22 at approximately 4:56pm. The motorist was Lisa M Fiorello, summons B228005683. I was informed that the Chiefs name is Jeffrey Maddrey and that after learning of the summons he called my Commanding Officer, Andrey Smirnov, and wanted to find out who wrote the summons and have them retaliated against. So my CO abused his authority by using department resources for personal reasons, had another supervisor in my precinct find out who wrote the summons, review the video to find out whether she was a nurse and if she mentioned the chiefs name or not and punish the officer. However, even though my car stop was a standard stop with no confrontation I am still being retaliated against solely because the motorist I summonsed knows a chief and that chief is now mad at me.

In my department these situations are common. I'm not the first and won't be the last. Usually the consequences are less severe but some members push for retaliation and the higher up the person, the more leverage they have. And of course if a chief calls my CO my CO will do what is asked because he too wants to be promoted and not anger his boss. Another reason why I believe it is a corrupt practice is because supervisors, detectives, and officers will review body camera footage solely for finding out if the officer intentionally wrote a summons to another members family/friend or if a courtesy card was presented and the officer wrote the summons anyway. And if the video is reviewed and it's determined the officer did not show preferential treatment to a bearer of a courtesy card, another MOS', family member, friend, etc. then the officer will be punished. Most of the time it's bullying, and threats but in some situations there is more severe retaliation. And in my situation a chief and deputy inspector can do what they want with impunity.

Most officers and supervisors are onboard with this practice because we all benefit. And I believe it is not only corrupt but it is a conflict of interest. My police union produces these cards and gets paid for them by officers. So it gives the union a reason to want them to be honored. When I came out of the Police Academy and had my orientation there was a union trustee there telling us not to write over cards.

Delegates in precincts will tell us not to write over cards. A PBA union trustee even called me once and told me that they are the ones that protect me so I better honor these cards otherwise they won't protect me when I need it and will even have a chief remove me from my unit if they need to. I don't think my union should have an interest in these cards if it will result in retaliation or lack of representation for an officer in need.

Not only that but all uniformed members and supervisors can purchase courtesy cards from their specific union. Usually you can purchase up to 30 cards if you are an active member and 10-20 if you are retired but people easily abuse that system and can get more. And if you think about it 30,000 active members getting 10 courtesy cards is 300,000 cards. And if each motorist of these motorists are stopped just once a year for a traffic infraction with an average cost of $130, it is almost 40 million dollars the city loses at a minimum. My calculations don't even take into account retired MOS or the fact that most members get more than 10 cards. This really adversely affects the class of motorists that have no affiliation with officers or aren't MOS. Because there's a higher chance they will get a summons. And that's unfair. If I have a quota to get 5 summonses and the first 3 motorists are not summonsed because I am forced to let them go due to courtesy card, being a nurse, etc. then the next motorist I can write will likely receive a summons because I'm not forced to let them go. That's just not fair.

I'm not going to lie and say I wouldn't be inclined to warn and admonish a members significant other if solely to avoid confrontation. But that's not the case on the majority of my car stops. It's not just members of service getting them for their mom, dad, son, etc. many members give these cards out for special favors. The owner of the restaurant that "hooks us up" gets some, the MOS with a side business gives it to his drivers, the landlord MOS gives it to their tenant that pays rent, the guy at the deli that gives us a dollar off our sandwich gets one, or the contractor that gives us a price break gets one too. We constantly use it for personal gain. This is a conflict of interest and a major integrity issue. Some members even give cards out to motorists they know are suspended. And most officers will see the card and not investigate it further. This is not only corrupt but it's a safety issue. There are no restrictions with these cards. I can literally give my cards out to a criminal and most officers won't look into it and will just let the motorist go. But because I question and fight against this practice I'm constantly bullied and punished because of it.

I don't expect courtesy cards or their variants to go away but supervisors should not be able to retaliate and punish for the sole reason that the motorist "had a card written over." And BWC footage should be reviewed for the proper reasons, not to find out if the cop knew the driver had a courtesy card or mentioned an officers name. I did also try to file a grievance with the commanding officer that retaliated against me but he brushed it off and denied it. There should be a system in place to protect officers that do enforcement from retaliation by supervisors because right now there is none."

218. This complaint constitutes protected speech as it occurred outside the score of Plaintiff's employment about a matter of public concern.

219. Also on September 3, 2022, Plaintiff files several complaints with multiple outside agencies over the retaliatory treatment.

220. Plaintiff also files a compliant of discrimination with the NYPD's Office of Equal Employment Opportunity.

221. On September 6, 2022, Plaintiff files a second complaint of discrimination.

222. In the protected complaints, Plaintiff complains about the disparate application of tickets to minority civilians.

223. Plaintiff in his many complaints stated that he was being unfairly retaliated against for conducting legal car stops and for issuing tickets to some offenders who had Courtesy Cards.

224. Plaintiff further states that based on his "sincerely held moral and ethical beliefs" he think it's unfair that some civilians who possess these cards can break the law with impunity and others, who do not have these cards are not afforded the same benefits.

225. Plaintiff further complains about Defendant SMIRNOV and his other supervisors constantly monitoring his body warn camera to see if he wrote over a card.

226. Immediately following these complaints, Plaintiff spoke with Sergeant Liter who informed Plaintiff that Defendant SMIRNOV is aware of his complaints and was extremely angry with Plaintiff.

227. Sergeant Liter stated that Defendant SMIRNOV was too angry to go into detail about Plaintiff's complaint.

228. Sergeant Liter did state that Defendant SMIRNOV informed him that since Plaintiff filed these complaints he must remain on patrol permanently and will not be sent back to the specialized Traffic Unit as he was previously told.

229. This permanent demotion came within weeks of Plaintiff's complaint of discrimination with the Office of Equal Employment Opportunity.

230. This was done in retaliation for Plaintiff's complaints of first amendment retaliation and discrimination.

231. This transfer back to patrol constitutes and adverse employment action as the specialized unit of Traffic within the precinct is a position which affords an officer the ability to transfer into specialized units outside of his Command.

232. Internally within the NYPD, being removed from a specialized unit within a command to regular patrol is viewed as a demotion.

233. Plaintiff was also transferred from day tour to the 4:00 pm to 12:00 am tour and changed squads within the command.

234. Each of these actions are viewed internally as a punishment and was meant to dissuade others from engaging in protected activity.

235. This was done purposefully as it disrupted Plaintiff's childcare arrangements and his time spent with his family.

236. Plaintiff would later overhear a woman from Roll Call, Marie Marchione, ask the Assistant Integrity Control Officer Sergeant Regina whether Plaintiff could be placed back into Traffic.

237. Plaintiff hears Regina state "no not now" to the request.

238. Following this conversation, Plaintiff tells Traffic Sergeant Liter that this is the definition of retaliation.

239. Sergeant Liter responds to Plaintiff by stating that he knows, he is sorry and there is nothing that he can do about it.

240. At all times here in the complaints about the Courtesy Cards constitute a matter of public concern.

241. First, the issuances of only warnings to people who are stopped with Courtesy Cards costs the City of New York millions of dollars a year in lost revenues.

242. The civilians who have Courtesy Cards often drive more recklessly than those who are worried about being issued a ticket which constitutes greater risk to the public.

243. Officers who stop someone with a Courtesy Card are bullied into issuing only a warning or fear being retaliated against.

244. Lastly, and most importantly, officers who are in a Traffic Unit are forced to write a certain amount of summonses per month which is known as a quota.

245. Courtesy Cards are disproportionately held by White Civilians.

246. Since these officers, including Plaintiff, are forced to meet a quota each month, and they are unable to issue summonses to people with Courtesy Cards, in practice, this results in minority civilians being illegally targeted for traffic stops so that the officers who stop them can meet their quota.

247. Plaintiff following his complaints, and true to Defendant SMIRNOV's word, Plaintiff was left on patrol.

248. To date, Plaintiff remains on regular patrol.

249. Plaintiff, every chance he got from this point forward, would complain to his supervisors about the retaliation he was being subjected to.

250. The supervisors, despite being mandated reporters to complaints of discrimination and retaliation, ignored Plaintiff's complaints without reporting them.

251. Instead of reporting Plaintiff's complaints, Plaintiff's supervisors would make fun of him for being retaliated against and still producing activity.

252. Internal Affairs, contrarily, did contact Plaintiff regarding his complaints.

253. Plaintiff fully participated in their investigation but no actions were taken to curb the retaliation or the preferential treatment to civilians with Courtesy Cards.

254. Following Plaintiff's demotion to regular patrol he applied for several other specialized positions within the Precinct.

255. Plaintiff had stellar performance evaluations yet was passed over for these positions due to his complaints about Courtesy Cards and discrimination.

256. Specifically, Plaintiff applied for the Neighborhood Coordinator Officer position, Youth Coordinator Officer position, Public Safety Officer, and the Traffic Safety Position.

257. Each of the aforementioned positions would have allowed Plaintiff to reach the maximum amount of hours of overtime per month.

258. In his current role, Plaintiff is only able to reach the maximum amount of overtime hours per month if he writes enough tickets that warrant additional overtime.

259. Plaintiff is not afforded other opportunities for overtime readily afforded other police officers in the Command.

260.  As a result, the aforementioned positions would allow Plaintiff to earn approximately $10,000- $20,000 a year in income in overtime.

261.  Further, these specialized positions make an employee more marketable within the NYPD which allows them to transfer to highly sought after positions which afford for upward mobility within the NYPD, more income, and a larger pension.

262.  Plaintiff was denied the Traffic Safety position despite having direct experience in traffic.

263.  This position was given to officer Diaz who had no traffic experience at the time he was chosen for this position.

264.  Diaz is similarly situated to Plaintiff in all material respects including duties, responsibilities, supervisors, titles, and all other respects.

265.  This position was given to Diaz despite having less time, in the NYPD and the 123 Precinct compared to Plaintiff on February 1, 2023.

266.  Despite being more qualified Plaintiff was denied this position in lieu of the Diaz in retaliation for his protected speech and complaints of discrimination.

267.  Plaintiff was denied this position in retaliation for his protected speech and complaints of discrimination.

268.  The Public Safety position was given to Police Officer John Latanzio.

269.  Latanzio is similarly situated to Plaintiff in every material way except that Latanzio has less time as a police officer than Plaintiff and Plaintiff engaged in protected speech.

270.  This position was given to Latanzio despite having less time, in the NYPD and the 123 Precinct compared to Plaintiff on February 1, 2023.

271.	Despite being more qualified Plaintiff was denied this position in lieu of the Latanzio in retaliation for his protected speech and complaints of discrimination

272.	Plaintiff was denied this position in retaliation for his protected speech and his engagement in protected activity.

273.	The Youth Coordinator Officer position was given to White police officer Samantha Simonetti on February 10, 2023.

274.	Simonetti is similarly situated to Plaintiff in all material respects including duties, responsibilities, supervisors, titles, and all other respects.

275.	This position was given to Simonetti despite having less time, in the NYPD and the 123 Precinct compared to Plaintiff.

276.	Despite being more qualified Plaintiff was denied this position in lieu of the Simonetti in retaliation for his protected speech and complaints of discrimination.

277.	Plaintiff expressed an interest in the position only to be told that he could not apply because the position had already been filled.

278.	Plaintiff was also denied the Neighborhood Coordinator position.

279.	This position was given to Detective Specialist Delacruz.

280.	Delacruz is similarly situated to Plaintiff in all material respects including duties, responsibilities, supervisors, and all other respects.

281.	This position was given to Delacruz despite having less time on than Plaintiff.

282.	Plaintiff was denied this position in retaliation for his protected speech and complaints of discrimination.

283.	Plaintiff also applied for the specialized units outside the 123rd Precinct.

284. Specifically, Plaintiff applied for the Highway Patrol and the NYPD's Canine Unit.

285. Plaintiff was interviewed for the Highway position but the position was given to Police officer Maciej Hajbert.

286. At the interview, the Commanding Officer repeatedly wondered aloud why Plaintiff was no longer in the Traffic Unit.

287. Plaintiff explained the situation.

288. At the end of the interview, the Commanding Officer of Highway informed Plaintiff that he was friends with both Chief Maddrey and Defendant SMIRNOV.

289. Plaintiff was passed over for the position.

290. Hajbert is similarly situated to Plaintiff in all material respects including duties, responsibilities, supervisors, titles, and all other respects.

291. This position was given to Hajbert despite having less time, in the NYPD and the 123 Precinct compared to Plaintiff.

292. Hajbert was chosen for the Highway position despite only issuing 68 summonses between January 1, 2022 and the present date.

293. In comparison, during that time, Plaintiff issued 978 summonses.

294. Despite being more qualified Plaintiff was denied this position in lieu of the Hajbert in retaliation for his protected speech and complaints of discrimination.

295. Plaintiff was never contacted regarding the canine position.

296. As a result of being passed over for each of these positions, Plaintiff lost thousands of dollars per year in lost income.

297.     On February 25, 2023, Plaintiff stopped the wife of Sergeant Richard Oscasio for driving without a seatbelt and running a red light.

298.     Sergeant Ocasio calls the command to prevent him from issuing the ticket.

299.     Plaintiff after being called and told not to write the ticket, gave the woman a warning because he was fearful of being retaliated against.

300.     During the process of the car stop, Sergeant Oscasio actually showed up to the scene in an effort to intimidate Plaintiff into not writing the ticket.

301.     Specifically Oscasio showed up to the car stop in a Tesla and proceeds to drive back and forth motioning to Plaintiff like he was going to stop and waving his shield out the window.

302.     In early March 2023, Plaintiff again complained about the retaliation for issuing tickets to civilians who have violated the law.

303.     On April 6, 2023 Defendant SMIRNOV was transferred to become the Commanding Officer 60th Precinct

304.     After Defendant SMIRNOV left the Command, Plaintiff spoke with the Integrity Control Officer about getting back into Traffic.

305.     The Integrity Control Officer stated that he would look into it.

306.     To date Plaintiff remains on patrol and on the 4:00 pm to 12:00 am tour.

307.     At all times herein, Plaintiff was retaliated against for engaging in protected activity.

308.     The Defendants herein had actual knowledge of the protected complaints and speech of Plaintiff.

309. The Defendants herein purposefully retaliated against Plaintiff for engaging in protected activity and speech in order to deter him and others from engaging in protected speech.

310. The Defendant CITY OF NEW YORK, at all times herein, is a public employer of Plaintiff.

311. Plaintiff, at all times herein, was a public employee of the Defendant CITY.

312. Plaintiff complained about the unlawful the use of courtesy cards and the disparate application of punishment because he believed them to be a violation of law, rule, regulation which created and presented a substantial and specific dange to the public health or safety.

313. Plaintiff complained about the unlawful the use of courtesy cards and the disparate application of punishment because he believed them to be an improper governmental action.

314. Plaintiff complained about the unlawful the use of courtesy cards and the disparate application of punishment because he believed them to be an improper governmental action.

315. Plaintiff engaged in protected activity when he complained about the use of courtesy cards and the disparate application of punishment under the law.

316. The Defendants were aware of Plaintiff protected complaints.

317. The Defendants retaliated against Plaintiff due to his protected complaints as described herein.

318. Plaintiff, as described herein, was subjected to disciplinary and adverse employment action as a result of Plaintiff's engagement in protected complaints under New York Civil Service law 75b.

**FIRST CAUSE OF ACTION**
**FIRST AMENDMENT RETALIATION**
**AGAINST DEFENDANTS' CITY OF NEW YORK And ANDREY SIMRNOV**
**DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. § 1983**

319. All previous allegations of this Complaint are incorporated herein as if fully set forth below.

320. All of the aforementioned acts of defendants, their agents, servants and employees, were carried out under the color of state law.

321. All of the aforementioned acts deprived plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First Amendment to the Constitution of the United States of America and in violation of 42 U.S.C. § 1983.

322. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all the actual and/or apparent authority attendant thereto.

323. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York, the New York City Police Department, all under the supervision of ranking officers of said department.

324. Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure,

or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**SECOND CAUSE OF ACTION**
**FIRST AMENDMENT RETAIATION**
**UNDER 42 U.S.C. § 1983**

325. All previous allegations of this Complaint are incorporated herein as if fully set forth below.

326. NYPD defendants' infringement upon and violation of plaintiff's rights protected under the First Amendment to the United States Constitution was intended to harm plaintiff, and to place a chilling effect upon the exercise of such rights by plaintiff and other persons as is their right, as provided by the U.S. Constitution and exercise of such rights.

327. Further, following plaintiff's engagement in protected speech the NYPD defendants unconstitutionally imposed this prior restraint on plaintiff's speech in an effort by

328. defendants to silence, intimidate, threaten, and prevent plaintiff from disclosing the evidence of corruption and misconduct plaintiff had been collecting and documenting to the media and the public at large.

329. Additionally, NYPD defendants demoted Plaintiff, denied him lucrative positions, denied him lucrative transfers in and out of the 123rd Precinct costing him thousands of dollars in an effort to prevent Plaintiff and others from engaging in protected speech.

330. The aforementioned conduct resulted in a chilling effect on plaintiff's speech thereby in an effort to prevent him from engaging in protected speech; or alternatively, to ultimately discredit his speech.

331. Further NYPD defendants' actions violated plaintiff's First Amendment right to speak out as citizen regarding a matter of extreme public concern, which constituted and fraud on the public and a breach of the public trust – namely widespread corruption, illegal practices, and the manipulation of issuance of civilian infractions  due to Courtesy Cards.

332. All of the actions taken by defendants following plaintiff's demotion were directly in violation of his rights as secured by the First Amendment of the Constitution.

333. NYPD defendants continued to attempt to impose this prior restraint on plaintiff's speech in an effort to silence, intimidate, threaten, and prevent plaintiff from disclosing the evidence of corruption and misconduct by plaintiff.

334. NYPD defendant's aforementioned conduct was not authorized by law and instead constituted a continued attempt to restrain plaintiff's speech from ever being uttered, which is presumptively unconstitutional.

335. Further, NYPD defendants' actions continued to deprive plaintiff's First Amendment right to speak out as citizen regarding a matter of extreme public concern, namely widespread corruption and illegal practices by the very same individuals sworn to protect the public at large.

336. As such, NYPD defendants conduct was in direct violation of plaintiff's right to freedom of speech as secured by the First and Fourteenth Amendments.

337. As a result of the foregoing, plaintiff was humiliated, in an attempt to restrain him from exercising his rights protected under the First Amendment to the United States Constitution and with the intent to harm plaintiff, and to place a chilling effect upon the exercise of such rights by plaintiff and other persons.

338. As a result of this violation, plaintiff is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

### THIRD CAUSE OF ACTION
### RETALIATION
### IN VIOLATION OF NEW YORK CITY
### ADMINISTRATIVE CODE § 8-107

339. Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

340. Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment in retaliation for Plaintiff engaging in protected activity.

341. Plaintiff engaged in protected activity when he complained of discrimination with the NYPD's Office of Equal Employment.

342. Plaintiff was retaliated against by the Defendants' THE CITY OF NEW YORK, and SMIRNOV, Individually, as a result of his engagement in protected activity.

343. Defendant's actions were taken under circumstances giving rise to an inference of retaliation.

344. The direct and proximate cause of Defendant's recklessness and negligence, Plaintiff was denied a promotion, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career, and business opportunities, suffered severe damage to his good name and

reputation, was denied overtime, and endured severe emotional pain and trauma, all to his detriment in an amount to be determined at trial.

345. Plaintiff alleges Defendants' THE CITY OF NEW YORK, and SMIRNOV, Individually, engaged in various unlawful employment actions against Plaintiff in retaliation for Plaintiff's lawfully protected complaints.

346. Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants' THE CITY OF NEW YORK, and SMIRNOV, Individually, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to his personal and professional reputation in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

**RETALIATION**
**STRICT LIABILITY IN VIOLATION OF**
**NEW YORK CITY ADMINISTRATIVE CODE § 8-107(13)(b)**

347. Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

348. Plaintiff alleges that New York City Administrative Code § 8-107 (13) (b), makes a Defendant strictly liable for the acts of managers and supervisors against a subordinate employee, such as the Plaintiff herein.

349. Plaintiff engaged in protected activity when he complained of discrimination with the NYPD's Office of Equal Employment.

350. The Defendant was aware of the actions of managers and supervisors but failed to take corrective remedial action which forced Plaintiff to be subjected to future retaliation.

351. The Defendant failed to exercise reasonable diligence to prevent such retaliatory conduct.

352. Plaintiff performed his job duties satisfactorily which is reflected in Plaintiff's stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's race, created a hostile work environment by the conduct of Defendants' THE CITY OF NEW YORK, and SMIRNOV, Individually, without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant CITY OF NEW YORK.

353. Defendant's actions were taken under circumstances giving rise to an inference of retaliation.

354. The direct and proximate cause of Defendant's recklessness and negligence, Plaintiff was denied a promotion, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career, and business opportunities, suffered severe damage to his good name and reputation, was denied overtime, and endured severe emotional pain and trauma, all to his detriment in an amount to be determined at trial.

355. The Defendant CITY OF NEW YORK is vicariously liable for the actions of their employees as described herein as they held a supervisory position to Plaintiff wherein, they exercised managerial and supervisory responsibility.

356. The Defendant CITY OF NEW YORK is vicariously liable for the actions of their employees as described herein as they held a supervisory position to Plaintiff wherein, they exercised managerial and supervisory responsibility.

357. The Defendant CITY OF NEW YORK is vicariously liable for the actions of their employees as described herein as they has actual and constructive notice of the discriminatory and retaliatory conduct as described herein yet failed to exercise reasonable diligence to prevent it.

358. As a result of Defendants', THE CITY OF NEW YORK, and SMIRNOV Individually, willful actions they are strictly liable to Plaintiff for their actions.

### FIFTH CAUSE OF ACTION

### VIOLATION OF NEW YORK CIVIL SERVICE LAW 75B

359. Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

360. Civil Service Law § 75-b provides, in pertinent part: "A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action.

361. "Improper governmental action" shall mean any action by a public employer or employee, or an agent of such employer or employee, which is undertaken in the

38

performance of such agent's official duties, whether or not such action is within the scope of his employment, and which is in violation of any federal, state or local law, rule or regulation.

362. Upon receiving Plaintiff's multiple complaints of corruption related to courtesy cards made to several different governmental bodies, Defendant retaliated against Plaintiff as a public employee. Plaintiff filed several reports that attempted to redress Defendant's corrupt practices as described herein.

363. These acts as defined by Civil Service Law § 75-b are classified as improper governmental action by a public employee. Plaintiff filed these complaints based on tangible evidence that caused him to reasonably believe Defendant engaged in improper governmental action.

364. Plaintiff is aware that the statute of limitations for a 75b claim is one year which means this claim related to any actions which occurred on or after May 30, 2022.

365. As a result of the foregoing, Plaintiff's career is irreparably damaged, and he sustained serious emotional distress and financial harm.

366. As a result of Defendants', THE CITY OF NEW YORK, and SMIRNOV Individually, willful actions they are liable to Plaintiff for their actions.

## JURY TRIAL

367. Plaintiff demands a trial by jury of all issues in this action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that the Court:

a. Award compensatory damages for the back pay, front pay, pain, suffering,

emotional distress, loss of dignity, humiliation, and damages to reputation and livelihood endured by Plaintiff  and all other damages afforded to Plaintiff by statute or otherwise in an amount to be determined at trial.

b.  Award Plaintiff punitive damages in an amount to be determined at trial New York City Human Rights Law Administrative Code §8-502(a).

c.  Find Defendants strictly liable pursuant to New York City Human Rights Law Administrative Code §8-107(13)(b).

d.  Award Plaintiff costs for this action and reasonably attorneys' fees, as provided for in New York City Human Rights Law Administrative Code §8-502 (f).

e.  All defendants herein are joint and severally liable for the actions of the any and all of the named Defendants herein.

f.  Grant Plaintiff such other and further relief as may be required in the interest of justice.

Dated: October 9, 2023

New York, NY

Respectfully submitted,

By:____/s/_____
        John Scola

Law Office of John A. Scola, PLLC
Attorneys for Mathew Bianchi
90 Broad Street Suite 1023
New York, New York 10004
(917) 423-1445
jscola@johnscolalaw.com

**VERIFICATION**

STATE OF NEW YORK        )
COUNTY OF NEW YORK    )

I, the undersigned, an attorney duly admitted to practice law in the State of New York, under penalties of perjury do affirm.

That I am the attorney of record for the plaintiff in the within matter and make this affirmation in accordance with CPLR 3020. I have read the within VERIFIED COMPLAINT and know the contents thereof to be true to your affirmant's own knowledge, with the exception of those matters therein stated to be alleged upon information and belief. Your affirmant bases his belief regarding those matters upon the contents of the file and conversation with witnesses and the claimant.

This verification is made by your affirmant and not by the claimant for the following reason: The claimants resides in a different County than where your affirmant maintains an office.

Dated: New York, New York
        October 9, 2023

_____/s/_____
JOHN SCOLA